## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| AUBREE HANSEN and SARAH PERDUE, individually and on behalf of all others similarly situated, | Civil Action No. 7:24-cv-1076 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **Jury Trial Demanded** |
| v. | |
| EMS LINQ, LLC d/b/a LINQ Connect, | |
| Defendant. | |

Plaintiffs Aubree Hansen ("Hansen") and Sarah Perdue ("Perdue") (collectively, "Plaintiffs") bring this class action complaint against Defendant EMS LINQ, LLC d/b/a LINQ Connect ("Defendant" or "LINQ Connect"). Plaintiffs make the following allegations based upon, *inter alia*, the investigation made by their counsel, and based upon information and belief, except as to those allegations specifically pertaining to Plaintiffs which are based upon their personal knowledge:

### PRELIMINARY STATEMENT

1.      This is a proposed class action seeking monetary damages, restitution, and injunctive and declaratory relief from LINQ Connect, a credit card payment processing company which owns and operates an account platform used by public schools across the country to facilitate payment for school meals (i.e., the LINQ Connect program).

1

2.     As of Fall 2023, more than 52 million students were enrolled at public schools throughout the United States.[1]

3.     Although federal policy specifies that schools must provide a fee-free option for school nutrition programs, LINQ Connect deceptively applies a "Convenience Fee" to all transactions through its LINQ Connect program. This Convenience Fee is applied whether a user is preemptively adding money to fund its account or is making payments on invoiced lunch purchases from the account.

4.     Over the course of a school year, these "Convenience Fees" significantly increase a family's total spending on school related costs.[2] In fact, the practice of charging such fees to student's school nutrition account transactions can collectively costs families upwards of $100 million each year. *See id.*

5.     Here is how it works: LINQ Connect implements a flat (convenience) fee model for every transaction, regardless of whether the student receives free or reduced-price lunches. As Convenience Fees are assessed on a per-transaction basis, they disproportionately affect lower-income families who must add smaller amounts more often, thereby incurring more transaction fees than higher-income users that can deposit larger amounts less frequently. *See id.* Flat fees are more expensive for consumers who have less financial liquidity or opt to pay invoices after the fact if the account cannot be substantially funded. Moreover, consumers do not have the

---

[1] U.S. Department of Education, Institute of Education Sciences, National Center for Education Statistics, Enrollment in public elementary and secondary schools, (retrieved April 2024), https://nces.ed.gov/programs/digest/d13/tables/dt13_203.20.asp.

[2] *See* Consumer Financial Protection Bureau, Costs of Electronic Payment in K-12 Schools, https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-costs-of-electronic-payments-in-k-12-schools/ (July 24, 2024).

opportunity to choose a different payment platform because contracts are determined at a school-district level. Simply put, caregivers have no control over fee rates and lack opportunities to shop around for cheaper options.

6. Worse yet, throughout the sign up process, LINQ Connect fails to inform consumers (let alone adequately) that such a fee will be charged on every transaction. Many consumers, like Plaintiffs, proceed through registering without ever noticing the Convenience Fee. Then, at checkout, and only after consumers have completed a comprehensive sign-up process (which includes inputting their child's student ID, allergy information, lunch preferences, etc.), LINQ Connect surreptitiously adds the Convenience Fee as a line item without any comment or description.

7. This is not by mistake. LINQ Connect intentionally adds the Convenience Fee at the end of the registration process to ensure consumers do not see it. The addition of the Convenience Fee at the *end* of the process as a line item is further deceptive because LINQ Connect knows (or should know) that even if consumers notice the Convenience Fee, given the comprehensive sign-up process, they are likely to pay it rather than starting over or trying to find a way to avoid it. Moreover, LINQ Connect also fails to notify consumers that there is another way to pay for the students' lunches without any Convenience Fee.

8. The Convenience Fee is a sham and a classic "junk fee." The purported "convenience" of "online processing" provided by LINQ Connect to facilitate school nutrition programs is the exact service that LINQ Connect provides—and it is a service that the school districts have already contracted and paid for. This groundless Convenience Fee is merely a surreptitious second form of free revenue (i.e., double dipping) that Defendant extracts at the

3

expense of consumers. Indeed, LINQ Connect profits from *both* the school districts and unsuspecting consumers, earning hundreds of millions of dollars per year.

9.      As a result, Plaintiffs and the Class were significantly harmed by Defendant's conduct. Plaintiffs, individually and on behalf of all others similarly situated, seek to end LINQ Connect's deceptive practices and obtain damages, restitution and equitable relief, as set forth below.

## PARTIES

10.      Plaintiff Hansen is a resident and a citizen of Phoenix, Arizona.

11.      Plaintiff Perdue is a resident and a citizen of Los Angeles, California.

12.      Defendant LINQ Connect is headquartered in Wilmington, North Carolina.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Class is comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff and one defendant.

14.      The Court has personal jurisdiction over Defendant because Defendant is headquartered in this district and conduct substantial business in this district.

15.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

4

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

A.     **Overview of School Nutrition Payment Programs.**

16.     As digital payments have become increasingly popular, more school districts around the country are offering parents and caregivers the ability to pay school-related expenses, including for field trips, athletics, and school lunches online through an exclusive payment processor.

17.     Families can access online payment portals through a link on their school district website, or through the payment processing company's own webpage or app. Depending on the district, schools may partner with one payment processor for all electronic payments or, for example, may have one platform for school meal payments and another for other school-related payments.

18.     Typically, the payment processor creates an account for the student which can be pre-funded with money to pay for school-related payments or provides after the fact invoices for the account's debited transactions.

19.     School districts contract with these third-party payment processing companies with the expectation that they will lower school district processing costs and increase administrative efficiency, accuracy, and security. LINQ Connect is one such third-party payment processing company.

B.     **Federal Law Prohibits Charging Additional Fees on School Nutrition.**

20.     The U.S. Department of Agriculture (USDA) has long established that children participating in school nutrition programs "shall not be charged any additional fees" for the services provided in conjunction with the delivery of school nutrition benefits because "by

5

charging fees in addition to the regular reduced price or paid meal charge, a school is limiting access to the program and imposing an additional criterion for participation." FNS Instruction 782-6 Rev. 1, Fees for Lunchroom Services (U.S.D.A. 2010), https://www.fns.usda.gov/cn/fees-lunchroom-services.

21. While federal law allows for the use of online payment systems, it requires that other payment options like payment by cash or check must be provided as alternatives.[3]

22. While USDA guidance requires that families are notified about available payment methods and associated fees, many of these contracted payment processors do not publish information related to fees on their websites. *Id*.

**C.** **LINQ Connect's Convenience Fee Scheme.**

23. The contract between LINQ Connect and the school district states that a Convenience Fee will apply to all account payments related to the school nutrition accounts facilitated through LINQ Connect's program. The school district can elect either a flat transaction fee ranging from $1.00-$2.60 or a percentage fee, which can be as high as 3.5% of the transaction. "The Fee will apply to each one-time, automated, and scheduled payment," meaning every time the student account is pre-funded, or anytime an invoice for the account is paid, a "Convenience Fee" is charged.[4]

---

[3] U.S. Department of Agriculture, Food and Nutrition Service, *Memo SP23-2017: Unpaid Meal Charges: Guidance and Q&A*, (March 23, 2017), https://www.fns.usda.gov/cn/unpaid-meal-charges-guidance-qas.

[4] *See* EMS LINQ Inc., *LINQ Connect Terms of Service*, (accessed Feb. 2024), https://linqconnect.com/main/terms.

24.     There are several issues with LINQ Connect's Convenience Fee. First, the Convenience Fee is not disclosed (let alone adequately) throughout the registration process. In fact, LINQ Connect does not disclose the Convenience Fee until the very last step in the registration after the purchase process is complete. Thus, by the time the Convenience Fee is surreptitiously introduced as a line item in their shopping cart, the consumer has already gone through several steps to set up their child's school nutrition account, including, *inter alia*, inputting personal information about their children, inputting lunch and allergy specifications, and deciding how much money to deposit into the child's account.

25.     Stated differently, consumers have already materially committed to the transaction by the time they are confronted with the Convenience Fee. This process fails to provide an adequate advance warning to customers that a Convenience Fee will be imposed on their purchases and payments.

26.     LINQ Connect also fails to disclose the purpose of the Convenience Fee. This omission is material because the Convenience Fee serves no real purpose, and is not actually a fee for any service as the school district itself is paying for use of LINQ Connect's systems. Instead, the Convenience Fee is a pure profit-generator.

27.     While some consumers notice the Convenience Fee and decide to proceed with the transaction given their investment in the registration process, many consumers never notice the addition of the Convenience Fee to their payment. Others are led to believe that they have no choice but to pay this Convenience Fee, even though federal law mandates that consumers be able to pay for school nutrition programs without fees.

7

**D.      The Convenience Fee is a Junk Fee That Violates Federal Guidance.**

28.      LINQ Connect's Convenience Fee is precisely the type of "Junk Fee" that has come

under government scrutiny in recent years:

> "Junk fees are fees that are mandatory but not transparently disclosed to consumers. Consumers are lured in with the promise of a low price, but when they get to the register, they discover that price was never really available. Junk fees harm consumers and actively undermine competition by making it impractical for consumers to compare prices, a linchpin of our economic system."[5]

29.      As the Federal Trade Commission said recently in its effort to combat Junk Fees,

> "[M]any consumers said that sellers often do not advertise the total amount they will have to pay, and disclose fees only after they are well into completing the transaction. They also said that sellers often misrepresent or do not adequately disclose the nature or purpose of certain fees, leaving consumers wondering what they are paying for or if they are getting anything at all for the fee charged."[6]

30.      In its own effort to combat junk fees, the State of New York recently passed N.Y.

Arts & Cult. Aff. Law § 25.07 concerning fees associated with tickets to sports and concerts.

Under that law, "[t]he price of the ticket shall not increase during the purchase process, excluding

reasonable fees for the delivery of non-electronic tickets based on the delivery method selected by

the purchaser, which shall be disclosed prior to accepting payment therefor." N.Y. Arts & Cult.

Aff. Law § 25.07(4). Accordingly, if the consumer selects to purchase a ticket electronically, at

the start of the transaction, the total ticket price shall not increase during the period it takes the

consumer to purchase the ticket (e.g., finish the online transaction).  The "All-In Price" must be

---

[5] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, March 5, 2024, available at https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/#_ftnref3

[6] Federal Trade Commission, *FTC Proposes Rule to Ban Junk Fees – Proposed rule would prohibit hidden and falsely advertised fees*, October 11, 2023, available at https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees

8

disclosed to the consumer before the consumer selects the ticket for purchase. Similarly here, the "All-In Price" should have been displayed to the consumer throughout the enrollment process.

31.     Recently, California expanded its Consumer Legal Remedies Act ("CLRA") to make illegal "drip pricing," which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service. *See* Cal. Civ. Code § 1770(a)(29). Under the new California law, it is illegal to advertise a low price for a product, only for that product to be subject to additional or mandatory fees later.

32.     In its 2013 publication ".com Disclosures: How to Make Effective Disclosures in Digital Advertising." the FTC makes clear that when advertising and selling are combined on a website, and the consumer will be completing the transaction online, the disclosures should be provided before the consumer makes the decision to buy – for example, before the consumer "add[s] to shopping cart."[7]

33.     Defendant ignores federal guidance by adding the Convenience Fee as a line item well after the consumer "add[s] to shopping cart," and by failing to disclose the nature of the Convenience Fee and whether consumers are getting any benefit at all from the fee charged.

34.     Moreover, there is no actual "convenience" or value provided to the consumers, especially since the school district itself pays for LINQ Connect's service. Accordingly, the Convenience Fee is a "junk fee" and nothing more than an opportunity for LINQ Connect to (improperly) double dip on its revenue stream.

---

[7] *See* Fed. Trade Comm'n, .com Disclosures: How to Make Effective Disclosures in Digital Advertising at ii, 14 (Mar. 2013), available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf

35.     Countless consumers believe that they *must* use LINQ Connect's service to pay for school meals and are unaware they have another choice in paying for school nutrition programs under federal law. LINQ Connect, of course, does not share this information with consumers and, thus, prevents parents or guardians from signing up in alternative manners that would allow them to avoid paying the Convenience Fee. In doing so, LINQ Connect holds its consumers captive under the (false) belief they have no choice but to use its services.

**E.     Plaintiff Hansen's Experience.**

36.     On or about January 11, 2023, Plaintiff Hansen created an account with Defendant and added $15.00 in funds to Linq Connect.

37.     At the time she registered for, and deposited money into, the school nutrition Linq Connect account, the Convenience Fee was hidden and not displayed until the ordering process was substantially complete. The Convenience Fee amounted to $2.60, increasing the total price to $17.60.

38.     Hansen did not notice that Defendant had increased the price of the transaction at the end of the purchase process through the addition of the Convenience Fee.

39.     Hansen was never made aware that she had an option to avoid paying the Convenience Fee and/or using Linq Connect services altogether.

40.     Had Defendant disclosed the Convenience Fee at an earlier time in the enrollment process, disclosed the nature of the Convenience Fee, and/or disclosed that she has the right to pay for school meals without incurring fees, Hansen would not have incurred the Convenience Fee and made a different choice with respect to whether to use LINQ Connect to purchase school meals.

10

### F. Plaintiff Perdue's Experience.

41. On or about September 11, 2024, Plaintiff Perdue created an account with Defendant and added $10.00 in funds to Linq Connect.

42. At the time she registered for, and deposited money into, the school nutrition Linq Connect account, the Convenience Fee was hidden and not displayed until the ordering process was substantially complete. The Convenience Fee amounted to $2.85, increasing the total price to $12.85.

43. Perdue did not notice that Defendant had increased the price of the transaction at the end of the purchase process through the addition of a Convenience Fee.

44. Perdue was never made aware that she had an option to avoid paying the Convenience Fee and/or using Linq Connect's services altogether.

45. Had Defendant disclosed the Convenience Fee at an earlier time in the enrollment process, disclosed the nature of the Convenience Fee, and/or disclosed that she has the right to pay for school meals without incurring fees, Perdue would not have incurred the Convenience Fee and made a different choice with respect to whether to use LINQ Connect to purchase school meals.

## CLASS ALLEGATIONS

46. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements.

> All persons who, during the applicable statute of limitations, were charged a Convenience Fee by Defendant.

47. Plaintiffs also bring alternative state subclasses on behalf of California and Arizona residents.

11

48.     The Nationwide Classes and alternative state subclass defined above are collectively referred to herein as the "Classes." Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

49.     Excluded from the Classes are Defendant, its consumers, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all personal accountholders who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

50.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of at least thousands of members, the identity of whom is within the knowledge of, and can be ascertained only by resort to, Defendant's records.

51.     The claims of the representative Plaintiffs are typical of the claims of the Classes she seeks to represent in that Plaintiff, like all members of the Classes, were charged improper and deceptive fees as alleged herein. The representative Plaintiffs, like all members of the Classes, were damaged by Defendant's misconduct in that they were charged hidden Convenience Fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes. And Defendant has no unique defenses that would apply to Plaintiffs and not the Classes.

52.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

53. The questions of law and fact common to the Classes include, but are not limited to, the following:

    a.    Whether Defendant's assessment of Convenience Fees was unfair, deceptive, and/or misleading;

    b.    Whether Defendant's assessment of Convenience Fees breached the contract;

    c.    The proper method or methods by which to measure damages and/or restitution and/or disgorgement; and

    d.    Whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief and the nature of that relief.

54. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, consumer class actions against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

55. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual member of the Classes' claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no member of the Classes could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

56. Even if members of the Classes themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.

13

Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

57.     Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

58.     Defendant has acted or refused to act on grounds generally applicable to each of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Classes as a whole.

59.     All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiffs and the Class)**

60.     Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–59 by reference as if fully set forth herein.

61.     Plaintiffs and Defendant have contracted for school nutrition program processing services.

62.     Defendant mischaracterized its true fee practices and breached the terms of the contract.

63.     Under North Carolina law, the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect

14

of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith is also mandated by the Uniform Commercial Code ("UCC"), which covers banking transactions.

64.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

65.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

66.     Defendant has breached the covenant of good faith and fair dealing through its "junk" Convenience Fee policies and practices as alleged herein.

67.     Defendant harms consumers by abusing its contractual discretion in a number of ways that no reasonable customer could anticipate.

68.     Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them by the contract.

69.     Plaintiffs and members of the Class have sustained damages as a result of Defendant's breach of the contract and breach of the covenant of good faith and fair dealing.

15

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment
### (On behalf of Plaintiffs and the Class)

70.     Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–59 by reference as if fully set forth herein.

71.     Plaintiffs bring this cause of action in the alternative to the breach of contract cause of action.

72.     To the detriment of Plaintiffs and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

73.     Plaintiffs and the Class conferred a benefit on Defendant when they paid Defendant the Convenience Fee, which they did not agree to and could not reasonably avoid.

74.     Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

75.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

76.     Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

## THIRD CLAIM FOR RELIEF
### Violation of the North Carolina Deceptive Trade Practices Act
### (On Behalf of Plaintiffs and the Class)

77.     Plaintiffs repeat, reallege, and incorporate the allegations in Paragraphs 1–59 by reference as if fully set forth herein.

78.     Defendant's business activities, including its application of Convenience Fees in its school nutrition payment program, are in or affecting "commerce" within the meaning of N.C.

16

Gen. Stat Ann. § 75-1.1.

79.    Defendant's Convenience Fees are unfair and/or deceptive because they are likely to cause confusion, deception, or mistake as to the source, affiliation, connection, association, or approval of school nutrition payments.

80.    Specifically, Defendant falsely advertises, displays, and offers to customers that they will pay one price throughout the school nutrition program sign up process. However, this is deceptive and misleading because Defendant applies "Convenience Fees" at the very end of the registration process and fails to advise consumers that they have a federally protected right to avoid paying such fees.

81.    Defendant's deceptive conduct as described herein is inherently unfair, unscrupulous and injurious to consumers, including to Plaintiffs and the Class

82.    Defendant's conduct alleged above constitutes unfair methods of competition and unfair or deceptive acts or practices in or affecting North Carolina commerce, as defined by N.C. Gen. Stat. §75-1.1.

83.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered and will continue to suffer pecuniary damages, including, but not limited to, losses and damages in an amount to be determined at trial.

84.    Defendant's conduct justifies an award of treble damages pursuant to N.C. Gen. Stat. § 75.16.

85.    Defendant willfully engaged in the acts and practices alleged in this complaint entitling Plaintiffs to recover its attorney's fees from Defendant under N.C. Gen. Stat. § 75-16.

**FOURTH CLAIM FOR RELIEF**
**Violation of Arizona Consumer Fraud Act ("ACFA")**
**(On behalf Plaintiff Hansen and the Arizona Subclass)**

86.     Plaintiff Hansen repeats, realleges, and incorporates the allegations in Paragraphs 1–59 by reference as if fully set forth herein.

87.     This count is brought pursuant to the Arizona Consumer Fraud Act ("ACFA"), Ariz. Rev. Stat. Ann. §§ 44-1521 through 44-1534.

88.     The ACFA prevents  businesses from engaging in any deception or unfair practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact in connection with the sale or advertisement of consumer goods or services. Ariz. Rev. Stat. § 44-1522(a).

89.     As described herein, Defendant violated the ACFA by knowingly and fraudulently deceiving consumers into paying unnecessary and unwanted Convenience Fees.

90.     Defendant, with the intent to mislead and deceive consumers, omitted information that was material and rationally significant to Plaintiff Hansen and the Class members in light of the services Defendant provided, including but limited to:

     a.  Omitting that consumers would be charged a Convenience Fee until the end of the registration process;

     b.  Omitting the purposes and nature of the service provided (or lack thereof) by its Convenience Fees; and

     c.  Omitting that there were alternative methods to pay for school nutrition programs as required by federal law.

91.     Plaintiff Hansen and the Class relied on Defendant's representations and/or omissions regarding its Convenience Fees in using its school nutrition program payment services.

18

92. Defendant's representations, omissions, and assessments of Convenience Fees as described herein constitutes an unconscionable commercial practice under the ACFA.

93. As a direct and proximate result of Defendant's deceptive and unconscionable acts and practices, Plaintiff Hansen and the Arizona Subclass were harmed and suffered ascertainable loss in that they were charged unnecessary Convenience Fees without any meaningful choice to opt out. Accordingly, they have suffered and will continue to suffer actual damages.

94. Plaintiff Hansen and the Arizona Subclass are entitled to relief including, but not limited to, actual damages, injunctive relief, and attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
### Violation of California's Unfair Competition Law
### (On Behalf of Plaintiff Perdue and the California Subclass)

95. Plaintiff Perdue repeats, realleges, and incorporates the allegations in Paragraphs 1–59 by reference as if fully set forth herein.

96. Defendant's conduct described herein violates the Unfair Competition Law ("UCL"), codified at California Business and Professions Code section 17200, *et seq.*

97. The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

98. The UCL imposes strict liability. Plaintiff Perdue need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

99. A business act or practice is "unfair" under the UCL if it offends an established

19

public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

100.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

101.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

102.   Defendant committed unfair and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by affirmatively and knowingly misrepresenting that the presence and nature of its Convenience Fees.

103.   Defendant's acts and practices offend an established public policy of truthful advertising in the marketplace, and constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

104.   The harm to Plaintiff Perdue and the California Subclass outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misleading and deceptive conduct described herein.

105.   Defendant's conduct also constitutes an "unlawful" act under the UCL because it also constitutes a violation of sections 1770(a)(5), (a)(9) and (a)(29) of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code section 1750, *et seq.*

106.   Defendant's business practices have misled Plaintiff Perdue and the proposed California Subclass and, unless enjoined, will continue to mislead them in the future.

107.   Plaintiff Perdue relied on Defendant's misrepresentations in making her purchase.

20

108.    By deceptively obscuring its school nutrition program payment practices and Plaintiff Perdue's right to avoid fees under federal law, Defendant deceived Plaintiff Perdue and California Subclass members into making purchases they otherwise would not make.

109.    As a direct and proximate result of Defendant's unfair, fraudulent, and unlawful practices, Plaintiff Perdue and California Subclass members suffered and will continue to suffer actual damages. Defendant's fraudulent conduct is ongoing and presents a continuing threat to Plaintiff Perdue and California Subclass members that they will be deceived. Plaintiff Perdue desires to conduct further business with Defendant but cannot rely on Defendant's representations unless an injunction is issued.

110.    As a result of its unfair, fraudulent, and unlawful conduct, Defendant has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff Perdue and California Subclass members pursuant to Cal. Bus. & Prof. Code § 17203 and 17204.

111.    Pursuant to Business & Professions Code §§ 17203 and 17500, Plaintiff Perdue and the members of the California Subclass, on behalf of the general public, seek an order of this Court enjoining Defendant from continuing to engage, use, or employ their unfair, unlawful, and fraudulent practices.

112.    Plaintiff Perdue has no adequate remedy at law in part because Defendant's conduct is continuing. Plaintiff Perdue therefore seeks an injunction on behalf of the general public to prevent Defendant from continuing to engage in the deceptive and misleading practices described herein.

## SIXTH CLAIM FOR RELIEF
### False and Misleading Advertising
### (On Behalf of Plaintiff Perdue and the California Subclass)

113.     Plaintiff Perdue repeats, realleges, and incorporates the allegations in Paragraphs 1–59 by reference as if fully set forth herein.

114.     California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code section 17500, states that "[i]t is unlawful for any . . . corporation . . . with intent . . . to dispose of . . . personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

115.     Defendant's material misrepresentations and omissions concerning its "junk" Convenience Fees alleged herein violate Business and Professions Code section 17500.

116.     Defendant knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

117.     Pursuant to Business and Professions Code sections 17203 and 17500, Plaintiff Perdue and the members of the California subclass, on behalf of the general public, seek an order of this Court enjoining Defendant from continuing to engage, use, or employ their deceptive practices.

118.     Further, Plaintiff Perdue requests an order awarding Plaintiff Perdue and California subclass members restitution of the money wrongfully acquired by Defendant by means of said

22

misrepresentations.

119.    Additionally, Plaintiff Perdue and the California subclass members seek an order requiring Defendant to pay attorneys' fees pursuant to California Civil Code section 1021.5.

**SIXTH CLAIM FOR RELIEF**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**(On Behalf of Plaintiff Perdue and the California Subclass)**

120.    Plaintiff Perdue repeats, realleges, and incorporates the allegations in Paragraphs 1–59 by reference as if fully set forth herein.

121.    This cause of action is brought pursuant to the Consumers Legal Remedies Act (CLRA), California Civil Code § 1750, *et seq.* Plaintiff Perdue and each member of the proposed Class are "consumers" as defined by California Civil Code § 1761(d). Defendant's payment processing and billing related to the purchase of school meals by consumers were "transactions" within the meaning of California Civil Code § 1761(e). The transactions with Defendant by Plaintiff Perdue and the Class concern "Services" within the meaning of California Civil Code § 1761(b).

122.    Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code § 1770(a) in transactions with Plaintiff Perdue and the Class which were intended to result in, and did result in, the payment Convenience Fees in connection with the purchase of school meals:

a.    "Misrepresenting the affiliation, connection, or association with, or certification by, another" (a)(3);

b.    "Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5);

c.    "Advertising goods or services with intent not to sell them as advertised"

23

(a)(9);

d.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14)

e.    "Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product" (a)(20); and

f.    "Advertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" (a)(29).

123.    Specifically, Defendant advertises, displays, and offers to customers that they will pay one price throughout the school nutrition program sign up process, but this is false because Defendant applies deceptive "Convenience Fees" at the very end of the registration process, and fails to advise consumers that they have a federally protected right to avoid paying such fees.

124.    At no time does Defendant disclose the true nature of its Convenience Fee; instead, it repeatedly conceals and misrepresents this material information at several steps of the transaction process.

125.    Pursuant to § 1782(a) of the CLRA, Plaintiff Perdue's counsel notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected

24

consumers of Defendant's intent to act. If Defendant fails to respond to Plaintiff Perdue' letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice, as proscribed by §1782, Plaintiff Perdue will move to amend his Complaint to pursue claims for actual, punitive and statutory damages, as appropriate against Defendant. As to this cause of action, at this time, Plaintiff Perdue seeks only injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class seek an Order:

1. Certifying the proposed Class pursuant to Rule 23;

2. Declaring the Defendant has committed the violations of law alleged herein;

3. Providing for any and all injunctive relief the Court deems appropriate;

4. Awarding statutory damages in the maximum amount for which the law provides;

5. Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

6. Providing for any and all equitable monetary relief the Court deems appropriate;

7. Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

8. Awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

9. Awarding pre- and post-judgment interest to the extent the law allows; and

10. Providing such further relief as this Court may deem just and proper.

25

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Dated: November 12, 2024

Respectfully submitted,

*/s/ David M. Wilkerson*
DAVID M. WILKERSON
NC State Bar No. 35742
Attorney for Plaintiff
The Van Winkle Law Firm
11 N. Market Street
Asheville, North Carolina 28801
(828)258-299 (phone)
(828)257-2767 (fax)
dwilkerson@vwlawfirm.com
Local Civil Rule 83.1(d) Counsel

Jeffrey D. Kaliel
KALIELGOLD PLLC
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Tel: (202) 350-4783
*jkaliel@kalielpllc.com*

Sophia Goren Gold
KALIELGOLD PLLC
950 Gilman Street, Suite 200
Berkeley, CA 94710
Tel: (202) 350-4783
*sgold@kalielgold.com*

*Counsel for Plaintiffs and the Proposed Classes*

26